**07 C 7144**

**JUDGE PALLMEYER
MAGISTRATE JUDGE ASHMAN**

# EXHIBIT A

APR-24-07  09:10  FROM-  T-768  P.002  F-471

# BULK CONTINUING LOAN PURCHASE AGREEMENT

## BY AND BETWEEN

## HOUSEHOLD FINANCIAL SERVICES, INC. and JV MORTGAGE CAPITAL, L.P.

## AND

## CREVE COEUR MORTGAGE

### DATED AS OF MARCH 10, 2000

TABLE OF CONTENTS

Page No.

SECTION 1 DEFINITIONS
    Section 1.1 Defined Terms ...................................................................................1
    Section 1.2 Other Terms .......................................................................................6

SECTION 2 PURCHASE OF LOANS AND TRANSFER OF SERVICING
    Section 2.1 Offer to Sell ........................................................................................6
    Section 2.2 Buyer's Response and Seller's Acceptance .......................................6
    Section 2.3 Purchase of Loans and Servicing Rights ...........................................7
    Section 2.4 Purchase Price ....................................................................................7
    Section 2.5 Premium Rebate .................................................................................7
    Section 2.6 Transfer of Servicing ..........................................................................8

SECTION 3 SETTLEMENT
    Section 3.1 Place and Time of Settlement ............................................................8
    Section 3.2 Seller's Deliveries at Settlement ........................................................8
    Section 3.3 Buyer's Deliveries at Settlement .......................................................8

SECTION 4 REPRESENTATIONS AND WARRANTIES
    Section 4.1 General Representations and Warranties of Seller ............................9
    Section 4.2 Representations and Warranties of Seller Regarding the Offered Loans ............11
    Section 4.3 Representations and Warranties of Seller Regarding the Loans ....12
    Section 4.4 General Representations and Warranties of Buyer .........................20

SECTION 5 PRE-SETTLEMENT COVENANTS
    Section 5.1 Continued Servicing .........................................................................21
    Section 5.2 Preparation of Assignments .............................................................21
    Section 5.3 IRS Reporting ...................................................................................21
    Section 5.4 Compliance with Law ......................................................................22
    Section 5.5 No Sale of Assets .............................................................................22
    Section 5.6 Private Mortgage Insurance .............................................................22

SECTION 6 POST-SETTLEMENT COVENANTS
    Section 6.1 Notice of Servicing Transfer ............................................................22
    Section 6.2 IRS Examination ..............................................................................22
    Section 6.3 Tax on Sale .......................................................................................23
    Section 6.4 Books and Records ..........................................................................23
    Section 6.5 On Site Audits ..................................................................................23
    Section 6.6 Financial Statements ........................................................................23
    Section 6.7 Post-Sale Loan Payments .................................................................23
    Section 6.8 Transfer of Servicing Rights ............................................................23
    Section 6.9 Delivery of Mortgage Loan Documents ..........................................23

SECTION 7 CONDITIONS TO SETTLEMENT .................................................................. 24
   Section 7.1 Conditions to Buyer's Obligations ................................................................ 25
   Section 7.2 Opinion of Counsel ....................................................................................... 25
   Section 7.3 Conditions to Seller's Obligations ................................................................

SECTION 8 SURVIVAL OF COVENANTS, REPRESENTATIONS AND WARRANTIES;
              REPURCHASE OBLIGATION OF SELLER ............................................... 26

SECTION 9 POST-SETTLEMENT AND ADJUSTMENTS
   Section 9.1 Repurchase Obligations ................................................................................ 27
   Section 9.2 Repurchase Price .......................................................................................... 27
   Section 9.3 Remedy to Insure Accuracy of Real Estate Appraisals ................................ 28
   Section 9.4 Post-Settlement Adjustment to Purchase Price ............................................. 28

SECTION 10 INDEMNIFICATION
   Section 10.1 Seller's Indemnification .............................................................................. 28
   Section 10.2 Buyer's Indemnification ............................................................................. 29
   Section 10.3 Indemnification Procedures ........................................................................ 29

SECTION 11 TERMINATION
   Section 11.1 Termination by Either Party ....................................................................... 30
   Section 11.2 Termination by Buyer ................................................................................. 31
   Section 11.3 Effect of Termination .................................................................................. 31

SECTION 12 MISCELLANEOUS
   Section 12.1  No Waiver ................................................................................................ 32
   Section 12.2  Amendment and Modification .................................................................. 32
   Section 12.3  Notices ..................................................................................................... 32
   Section 12.4  Expenses .................................................................................................. 33
   Section 12.5  No Remedy Exclusive .............................................................................. 34
   Section 12.6  Independent Contractor ........................................................................... 34
   Section 12.7  Severability ............................................................................................. 34
   Section 12.8  Entire Agreement .................................................................................... 34
   Section 12.9  Assignment ............................................................................................. 34
   Section 12.10 Captions .................................................................................................... 34
   Section 12.11 Governing Law ......................................................................................... 34
   Section 12.12 Counterparts .............................................................................................. 35
   Section 12.13 Drafting .................................................................................................... 35
   Section 12.14 Choice of Forum ....................................................................................... 35
   Section 12.15 WAIVER OF JURY TRIAL .................................................................... 35

## EXHIBITS

Exhibit A - Contents of Legal File ............................................................................. E-1
Exhibit B - Contents of Credit File+ ........................................................................... E-3

## SCHEDULES

Schedule 1 - Information to be Included in Offered Loan Schedule ........................ S-1
Schedule 2 - Seller's Underwriting Standards for Mortgage Loans ........................ S-3

APR-24-07　09:11　FROM-　　　　　　　　　　　　　　　　　　　　T-768　P.006　F-471

# BULK CONTINUING LOAN PURCHASE AGREEMENT

THIS BULK CONTINUING LOAN PURCHASE AGREEMENT is dated as of this 10TH day of March, 2000 by and between HOUSEHOLD FINANCIAL SERVICES, INC., a Delaware corporation, and its affiliates, or JV MORTGAGE CAPITAL, L.P., a Delaware limited partnership (respectively or collectively, "Buyer"), and CREVE COEUR MORTGAGE, a Missouri Corporation ("Seller").

　　　　WHEREAS, Seller is engaged in the business of originating, acquiring and servicing fixed and adjustable rate, mortgage loans, and has proposed to offer to sell portfolios of such loans to Buyer from time to time subject to Buyer's review and acceptance of all or any part of each such portfolio; and

　　　　WHEREAS, Seller desires from time to time to sell to Buyer, and Buyer desires from time to time to purchase from Seller certain loans due and to become due thereunder.

　　　　NOW THEREFORE, in consideration of the premises and other covenants contained herein, Buyer and Seller agree as follows:

## SECTION 1   DEFINITIONS

　　Section 1.1   Defined Terms

　　　　"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the Person specified.

　　　　"Acceptance" means an acknowledgment that Seller has executed, indicating Seller's acceptance of Buyer's proposal to purchase a portfolio of Loans pursuant to the terms set forth in the Response.

　　　　"Accepted Servicing Practices" means with respect to any Loan, those mortgage servicing practices of prudent mortgage lending institutions that service mortgage loans of the same type as such Loan in the jurisdiction where the related Mortgaged Property is located.

　　　　"Appraised Value" means the amount set forth in an appraisal in connection with the origination of each Loan as the value of the Mortgaged Property.

　　　　"Assignment of Mortgage" means an assignment of the Mortgage, notice of transfer or equivalent instrument, in recordable form, which when recorded is sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect of record the sale of the Mortgage to the Buyer, or its assignee.

"Bid Percentage" means a percentage of the Pool Balance, determined by Buyer in its sole discretion, on which the Purchase Price is based.

"Business Day" means any day other than (a) Saturday or Sunday, or (b) a day on which financial institutions in the States of Delaware or Illinois are authorized or required by law, executive order or governmental decree to be closed.

"Buyer" means, respectively or collectively, Household Financial Services, Inc., a Delaware corporation, and its affiliates, or JV Mortgage Capital, L.P., a Delaware limited partnership.

"Credit File" means with respect to any Loan, the file containing those items listed in Exhibit B annexed hereto, and any additional documents required to be added thereto pursuant to this Agreement.

"Cut-off Date" means, with respect to each Offer, the date as of which the Principal Balance and the Pool Balance are determined.

"Due Date" means the day of the month on which each Monthly Payment is due on a Loan, exclusive of any days of grace.

"Due Diligence Period" means the period as agreed to by Buyer and Seller and ending when Buyer submits a Response unless otherwise agreed to in writing. During such period Seller shall make the Loan Documents and any information, records and files pertaining to the Offered Loans available to Buyer at its offices located in _Creve Coeur, Missouri_ or at any other location mutually agreed upon by Buyer and Seller.

"ECOA" means the Equal Credit Opportunity Act, 15 U.S.C. § 1601.

"Escrow Payment" means with respect to any Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Obligor with the mortgagee pursuant to the Mortgage or any other document.

"Excluded Loans" means the Offered Loans owned by Seller and offered for sale to Buyer pursuant to an Offer, which Offered Loans Buyer elects not to purchase, and which Offered Loans shall be listed in Schedule A to the Response.

"FHLMC" means the Federal Home Loan Mortgage Corporation.

"FNMA" means the Federal National Mortgage Association.

"First Mortgage Loan" means with respect to each Offer those Loans secured by a valid Mortgage that represents a first lien.

"GNMA" means the Governmental National Mortgage Association.

"Interest Rate Adjustment Date" means the date on which the Mortgage Interest Rate is adjusted with respect to each Loan. The first Interest Rate Adjustment Date is the date set forth on the Loan Schedule.

"IRS" means the Internal Revenue Service.

"Legal Fees" shall mean with respect to any indemnified party, any and all fees, costs, and expenses of any kind reasonably incurred by such party or its counsel investigating, preparing for, defending against, or providing evidence, producing documents, or taking other action with respect to, any threatened or asserted claim.

"Legal File" means with respect to any Mortgage Loan, the file containing those items listed in Exhibit A annexed hereto, and any additional documents required to be added thereto pursuant to this Agreement.

"Loan" means each loan selected by Buyer to purchase from the Offered Loans owned by Seller and offered to Buyer pursuant to each Offer, which Loans collectively, shall be listed in the Offered Loan Schedule.

"Loan Documents" means all of Seller's original agreements with any Obligor of a Loan, and all of the following in the original (except as otherwise noted) to the extent they exist in Seller's loan files, for any Loan that Buyer proposes to buy pursuant to its Response: all loan applications, correspondence, general credit information, file maintenance information, payment histories, credit information files, records, executed notes (which may be copies), documents, disclosures, receipts, drafts, instruments, notices, acknowledgments, mortgages (which may be copies), deeds of trust (which may be copies), security deeds (which may be copies), title insurance policies, title opinions, property appraisals, property surveys, insurance policies, property insurance policies, mortgage insurance policies, flood insurance policies, guarantees, and any like and other information relating to the Loans that is maintained in individual loan files or on a loan-by-loan basis, including such data stored on microfilm, microfiche, magnetic tape, computer disc, or in any other form.

"Loan Schedule" means the list of Loans, consisting of the Offered Loans less any Excluded Loans.

"Loan-To-Value Ratio" or "LTV" means with respect to any Loan, the ratio of the outstanding principal amount of the Loan and, if the Loan purchased hereunder is secured by a second lien, any lien on the Mortgaged Property senior to the lien of the Loan as of the origination date to the lesser of (a) the Appraised Value of the Mortgaged Property and (b) if the Loan was

3

made to finance the acquisition of the related Mortgaged Property, the purchase price of the Mortgaged Property, expressed as a percentage.

"Monthly Payment" means the scheduled monthly payment of principal and interest on a Loan.

"Mortgage" means, with respect to a Loan, any mortgage, deed of trust, security deed, or other similar instrument creating a lien on residential real property to secure repayment of such Loan, or a true and correct copy thereof.

"Mortgage File means collectively, the Credit File and the Legal File for any Loan.

"Mortgage Interest Rate" means the annual rate of interest borne on a Note, net of any primary mortgage guaranty insurance premium.

"Mortgaged Property" means, with respect to each Mortgage, the property subject to such Mortgage.

"Note" means, with respect to a Loan, the original promissory note executed by the respective Obligor to evidence such Obligor's indebtedness under such Loan.

"Obligor" means, with respect to an Offered Loan, any person obligated for payment of such Offered Loan or who has transferred or assigned any property interest to Seller to secure payment of such Offered Loan.

"Offer" means each offer from Seller to Buyer to sell a portfolio of Offered Loans and the right to service each such Offered Loan pursuant to the procedures set forth in Section 2.1, which Offer shall include an Offered Loan Schedule.

"Offer Date" means, with respect to each Offer, the date on which Seller sends such Offer to Buyer.

"Offered Loan" means any mortgage loan that is secured by a first or second position lien on completed, one-to-four family residential real estate, and that Seller owns and offers to Buyer to purchase pursuant to an Offer.

"Offered Loan Schedule" means the schedule of Offered Loans attached to the Offer, which lists to the extent and as available the mapping document information relating to each Offered Loan required to be included in each Offer, as set forth in Schedule 1 to this Agreement, and which shall be in electronic format and, if requested by Buyer, hard copy.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Pool Balance" means, with respect to each Offer and each portfolio of Loans to be purchased pursuant to this Agreement, the aggregate outstanding Principal Balance of the Loans in such portfolio as of the Cut-off Date.

"Premium" means the product of the Principal Balance times the Bid Percentage, minus the Principal Balance.

"Principal Balance" means, with respect to a Loan and a particular Offer, the unpaid principal balance of such Loan as of the Cut-off Date, as shown on the books and records of Seller; provided that the Principal Balance shall not include any accrued but unpaid fees or charges.

"Purchase Price" means, the price paid by Buyer for the Loans acquired pursuant to the Response, which shall be calculated according to the following formula:

(a) the product of

  (i) the Bid Percentage and

  (ii) the Pool Balance minus the aggregate amount, if any, of all payments of principal made to and retained by Seller on the Loans acquired from the Cut-off Date up to, but not including, the Settlement Date,

(b) plus

  (i) accrued but unpaid interest on each of the Loans at the applicable per annum interest rate, as set forth on the Loan Schedule from the paid-to-date of interest up to, but not including the Settlement Date.

"RESPA" means the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq.

"Response" means the letter from Buyer to Seller setting forth the Bid Percentage and attaching as Schedule A, a list of any Excluded Loans.

"Second Mortgage Loan" means with respect to each Offer those Loans secured by a Mortgage which represents a second lien.

"Seller" means Creve Cour Mortgage Associates Inc, a Missouri corporation.

"Service Transfer Date" means, unless otherwise agreed by the parties, the date which is 15 days after the date on which Seller sends its notices pursuant to Section 6.1 and on which Seller transfers to Buyer or Buyer's designee all servicing responsibilities relating to all the Loans sold on the corresponding Settlement Date pursuant to Section 2.6.

5

APR-24-07   09:12   FROM-                                           T-768   P.011/067   F-471

"Settlement" means, with respect to each portfolio of Loans to be sold pursuant to this Agreement, the satisfaction of the conditions set forth in Section 7, and the sale and purchase of, such portfolio of Loans.

"Settlement Date" means each date mutually agreed upon by the parties on which Seller sells and Buyer acquires a portfolio of Loans.

"TILA" means the Truth in Lending Act, 15 U.S.C. § 1600 et seq.

Section 1.2 Other Terms

(a) Accounting and financial terms used herein and not otherwise defined in this Agreement shall be construed in accordance with generally accepted accounting definitions and principles as consistently applied.

(b) Words used in this Agreement in the singular, where the context so permits, shall be deemed to include the plural and vice versa.

## SECTION 2 PURCHASE OF LOANS AND TRANSFER OF SERVICING

Section 2.1 Offer to Sell.

(a) From time to time, Seller may submit an Offer to Buyer and Buyer may agree to buy any or all of the Offered Loans listed in such Offer and the right to service those Offered Loans pursuant to the terms of this Agreement and any Schedules and Exhibits hereto. Such sale and transfer shall be subject to the provisions of this Agreement.

(b) Each Offer shall be sent to Buyer by hand delivery, overnight courier or modem and shall be accompanied by a letter notifying Buyer that Seller is making an Offer to sell the Offered Loans at a Purchase Price based on a Bid Percentage, which shall be determined by Buyer, and which shall be subject to acceptance by Seller. Each Offer shall attach an Offered Loan Schedule, which shall include mapping document information relating to each Offered Loan according to the format and criteria set forth in Schedule 1 to this Agreement. Seller shall bear all costs of sending the Offer and Offered Loan Schedule to Buyer.

Section 2.2 Buyer's Response and Seller's Acceptance.

(a) If Buyer chooses to purchase any or all of the Offered Loans, Buyer shall notify Seller within a reasonable period of time after the end of the Due Diligence Period via the Response. The Response will set forth the terms and conditions of the proposed purchase including, without limitation, the proposed Bid Percentage.

(b) Seller shall indicate its acceptance of Buyer's Response by executing and returning the Response to Buyer within the time frame set forth therein. If Seller does not execute and return the Response within such time frame, Buyer's proposal to purchase the Loans pursuant to the terms of the Response shall automatically expire, unless Buyer agrees to extend the period for acceptance of the Response.

(c) By executing the Response, Seller agrees to sell the Loans, or cause the Loans to be sold to Buyer pursuant to and in accordance with the terms of the Response and this Agreement.

Section 2.3 **Purchase of Loans and Servicing Rights**.

(a) Subject to the terms and conditions set forth in this Agreement,

(i) Seller shall sell, transfer, assign, and convey to Buyer, without recourse, but subject to the terms of this Agreement, and Buyer shall purchase and take on the Settlement Date, all of Seller's right, title, and interest in and to the Loans listed in the Response;

(ii) Seller shall sell, transfer, assign, and convey to Buyer, and Buyer shall purchase and take on the Settlement Date, all of Seller's right, title, and interest in and to all escrow deposits held in connection with the Loans listed in the Response; and

(iii) Seller shall also irrevocably assign to Buyer, and Buyer shall take on the Settlement Date, Seller's right to service each Loan sold pursuant to the Response and to collect any servicing fee in connection with such Loan.

Section 2.4 **Purchase Price**. The Purchase Price for the Loans purchased at each Settlement shall be based on the Bid Percentage set forth in the Response and shall be calculated according to the formula set forth in the definition of the term Purchase Price.

Section 2.5 **Premium Rebate**. In the event that a Premium is paid by the Buyer to the Seller on a Loan and such Loan is prepaid in full by the Borrower, other than by a refinancing by the Buyer or any of its subsidiaries or affiliates, within twelve (12) months of Settlement Date, the Seller shall, upon demand by the Buyer, refund to the Buyer the Premium paid by the Buyer to the Seller as follows: if prepayment in full is within one (1) month of the Settlement Date, 12/12ths of the Premium shall be refunded; if prepayment in full is between one (1) and two (2) months of the Settlement Date, 11/12ths of the Premium shall be refunded; if prepayment in full is between two (2) and three (3) months of the Settlement Date, 10/12ths of the Premium shall be refunded; if prepayment in full is between three (3) and four (4) months of the Settlement Date, 9/12ths of the Premium shall be refunded; if prepayment in full is between four (4) and five (5) months of the Settlement Date, 8/12ths of the Premium shall be refunded; if prepayment in full is between five (5) and six (6) months of the Settlement Date, 7/12ths of the Premium shall be refunded; if prepayment in full is between six (6) and seven (7) months of the Settlement Date, 6/12ths of the Premium shall be refunded; if prepayment in full is between seven (7) and eight (8) months of the Settlement Date,

5/12ths of the Premium shall be refunded; if prepayment in full is between eight (8) and nine (9) months of the Settlement Date, 4/12ths of the Premium shall be refunded; if prepayment in full is between nine (9) and ten (10) months of the Settlement Date, 3/12ths of the Premium shall be refunded; if prepayment in full is between ten (10) and eleven (11) months of the Settlement Date, 2/12ths of the Premium shall be refunded; if prepayment in full is between eleven (11) and twelve (12) months of the Settlement Date, 1/12th of the Premium shall be refunded. In the event any Loan is prepaid in full later than twelve (12) months from the Settlement Date of such Loan, no refund shall be due. In the event the Note carries a prepayment penalty, the Buyer agrees to recapture the Premium rebate from the proceeds of the prepayment penalty and then from Seller, if there is any deficient balance according to the refund calculation specified above.

Section 2.6  Transfer of Servicing. As of each Settlement Date, Seller shall transfer to Buyer any and all rights to service the Loans sold on the related Settlement Date, including but not limited to Seller's right to receive all payments and receivables with respect to the Loans, ownership of Escrow Payments, and all servicing rights as owner and holder of the Loans. Notwithstanding the foregoing, Seller shall continue to service the Loans for Buyer following the Settlement Date and until the corresponding Service Transfer Date as set forth in Section 5.1, and Buyer shall assume responsibility for servicing the Loans on and after such Service Transfer Date. Seller shall ensure that all escrow balances are received by Buyer within three (3) days of the Service Transfer Date. If such balances are not received by Buyer within three (3) days Seller shall remit to Buyer in immediately available funds, an amount equal to said balances.

## SECTION 3  SETTLEMENT

Section 3.1  Place and Time of Settlement. Each Settlement shall take place via facsimile and wire transfer with original documents delivered via overnight courier on the Settlement Date, which shall be within 2 Business Days of the satisfaction of all conditions to Settlement, as set forth herein, or on such other day as mutually agreed to by the parties.

Section 3.2  Seller's Deliveries at Settlement. On or before each Settlement, Seller shall deliver the following to Buyer:

(a) the form of notice of servicing transfer, to be sent by Seller pursuant to Section 6.1 for each Loan as required by RESPA, which form shall indicate the date on which it shall be sent by Seller;

(b) the Mortgage File with respect to each Loan sold at such Settlement, the contents of which are subject to the approval of Buyer and its legal counsel as to proper form and execution provided, however, to the extent Seller continues to service the Loans after Settlement, the Credit File shall be retained by Seller and delivered to Buyer ten (10) days prior to the Service Transfer Date; and

(c) all other documents, instruments and writings required to be delivered by Seller prior to or at such Settlement pursuant to Section 7.1 of this Agreement or as reasonably requested by Buyer.

Section 3.3  <u>Buyer's Deliveries at Settlement</u>.  At each Settlement, Buyer shall deliver the following to Seller:

(a) the Purchase Price for the Loans sold at such Settlement by wire transfer of immediately available funds in U.S. dollars to the account designated by Seller.

## SECTION 4  REPRESENTATIONS AND WARRANTIES

Section 4.1  <u>General Representations and Warranties of Seller</u>.  As of the date hereof, and as of each Settlement Date, Seller represents and warrants as follows:

(a) <u>Organization</u>.  Seller is a corporation, duly organized, validly existing, and in good standing under the laws of the State of Missouri, and is qualified and authorized to transact business in, and is in good standing under the laws of, each jurisdiction in which any Mortgaged Property is located or is otherwise exempt under applicable law from such qualification. Seller has the requisite corporate power and authority to own and operate its properties, to carry on its business as it is now being conducted, and to consummate the transactions contemplated by this Agreement.

(b) <u>Authorization of this Agreement</u>.  Seller has the requisite corporate power and authority to execute and deliver this Agreement, and to consummate the transactions contemplated hereby.  The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action, and no other corporate proceedings on the part of Seller are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Seller and constitutes a legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforcement may be affected by bankruptcy, by other insolvency laws, or by general principles of equity.

(c) <u>Ordinary Course of Business</u>.  The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of Seller, and the transfer, assignment and conveyance of the Notes and the Mortgages by Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction.

(d) <u>No Conflict or Violation</u>.  The execution and delivery of this Agreement by Seller does not, and the performance of this Agreement by Seller will not, (i) result in a violation of or conflict with any provisions of the charter or by-laws or equivalent governing instruments of Seller, (ii) violate any law, rule, regulation, code, ordinance, judgment, injunction, order, writ, decree, or ruling applicable to Seller, or (iii) conflict with or violate any agreement, permit, concession, grant, franchise, license, or other governmental authorization or approval necessary for sale of the Loans by Seller.  No regulatory approvals or consents are required with respect to Seller's consummation of the transactions contemplated by this Agreement.

9

(e) <u>Litigation</u>. No action, suit, proceeding, or governmental investigation or inquiry is currently pending, or to the knowledge of Seller, threatened against Seller which, if adversely determined, would have a material adverse effect on the business, combined assets or financial condition of Seller or on the Loans or would prevent the consummation of the transactions contemplated by this Agreement.

(f) <u>Financial Condition</u>. Seller has previously furnished Buyer with Seller's most recent audited financial statements, together with the respective reports thereon of the Seller's independent public accountants, and Seller's most recent unaudited financial statements, each of which has been prepared in accordance with generally accepted accounting principles. Each of the balance sheets included in the financial statements sets forth Seller's financial condition as of the date thereof, and there have been no material adverse changes in Seller's business or financial condition since that date.

(g) <u>Accuracy of Statements</u>. Neither this Agreement, nor any statement, report, or other document furnished or to be furnished pursuant to this Agreement, or in connection with the transaction contemplated hereby, contains any untrue statement of fact by Seller, or omits to state a fact, necessary to make the statements of Seller contained therein not misleading.

(h) <u>Fidelity Bond</u>. Upon request Seller will deliver to Buyer a true and correct copy of Seller's fidelity bond and Seller's errors and omissions policy, as currently in effect, the amounts and coverages of both of which will be acceptable to Buyer. Seller shall, at its own expense, maintain a fidelity bond and an errors and omissions policy, in amounts at least as great as, and with the coverages at least as broad as, those currently in effect. Seller shall upon request furnish proof of such coverage at or before the first Settlement and, upon request, annually thereafter.

(i) <u>Ability to Perform: Solvency</u>. Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement. Seller is solvent and sale of the Mortgage Loans will not cause Seller to become insolvent. The sale of the Loans is not undertaken with the intent to hinder, delay or defraud any of the Seller's creditors.

(j) <u>No Consent Required</u>. No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Seller of or compliance by Seller with this Agreement or the Loans, or the sale of the Loans to the Buyer or the consummation of the transactions contemplated by this Agreement, or if required, such approval has been obtained prior to each Settlement Date.

(k) <u>Selection Process</u>. The Loans were not intentionally selected in a manner so as to adversely affect the interests of the Buyer.

(l) <u>Commissions to Third Parties</u>. Seller has not dealt with any broker or agent or other Person who might be entitled to a fee, commission or compensation in connection with this transaction other than the Buyer except as Seller has previously disclosed to Buyer in writing.

10