UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HSBC MORTGAGE SERVICES, INC., ) | |
| ) | |
| Plaintiff, ) | No.: 07 C 7144 |
| ) | |
| v. ) | Judge Rebecca R. Pallmeyer |
| ) | |
| CREVECOR MORTGAGE, INC. ) | |
| ) | |
| Defendant. ) | |

**AFFIDAVIT OF ROBERT K. CARSE IN SUPPORT
OF PLAINTIFF HSBC'S MOTION FOR ENTRY OF
JUDGMENT BY DEFAULT PURSUANT TO FED. R. CIV. P. 55(b)(2)**

Robert K. Carse, being duly sworn, deposes and states as follows:

1.  I am Robert K. Carse, Vice President of HSBC Mortgage Services, Inc. ("HSBC Mortgage Services"). My office is located at 577 Lamont Road, Elmhurst, IL 60126.

2.  At HSBC Mortgage Services, I am the employee responsible for monitoring and managing claims HSBC Mortgage Services has under the governing agreements with CreveCor Mortgage, Inc. ("CreveCor"). In fulfilling those responsibilities, I have gained personal knowledge of the facts and circumstances surrounding such loans through my own investigation, review of the relevant business records maintained by HSBC Mortgage Services, and communicating with other knowledgeable employees.

3.  I am familiar with HSBC Mortgage Services records and data compilations pertaining to the loans purchased from CreveCor. Such records and data compilations are kept in the ordinary course of HSBC Mortgage Services' business and are prepared at, or near, the time of the acts, events conditions or opinions reflected therein.

4. I am over eighteen years of age and familiar with the facts and matters stated herein based upon my personal involvement with the loans purchased from CreveCor as described above. If called and sworn as a witness, I could testify competently to such facts and matters.

5. I make this affidavit in support of Plaintiff HSBC Mortgage Services' Motion for Entry of Judgment by Default Pursuant to Fed. R. Civ. P. 55(b)(2) (the "Motion").

**The Loan Purchase Agreements**

6. CreveCor is in the business of originating and selling mortgage loans. HSBC Mortgage Services in turn purchases mortgage loans.

7. In March 2000, to facilitate future sales of mortgage loans by CreveCor to HSBC Mortgage Services (collectively, the "Parties"), and for good and sufficient consideration, the Parties entered into two loan purchase agreements.

8. In those agreements, the Parties set forth various terms and conditions under which CreveCor could, from time to time, offer portfolios of mortgage loans for sale to HSBC Mortgage Services, and under which HSBC Mortgage Services could accept or reject such offers.

9. Specifically, the Parties first entered into the Bulk Loan Purchase Agreement, dated as of March 10, 2000 (the "Bulk Loan Purchase Agreement"). A true and correct copy of the Bulk Loan Purchase Agreement is attached hereto as Exhibit A.

10. The Parties then entered into the Flow Loan Purchase Agreement dated March 30, 2000 (the "Flow Loan Purchase Agreement"). A true and correct copy of the Flow Loan Purchase Agreement is attached hereto as Exhibit B. The Bulk Loan Purchase Agreement and

the Flow Loan Purchase Agreement shall be collectively referred to as the "Loan Purchase Agreements."

**The Premium Rebate Provisions**

11. As part of the Loan Purchase Agreements, the Parties agreed to a formula for calculating the purchase price of the loans that CreveCor offered to HSBC Mortgage Services. (*See* Ex. A (Bulk Loan Purchase Agreement) § 2.3, § 1.1 (definition of "Purchase Price"); Ex. B (Flow Loan Purchase Agreement) ¶ 7a.)

12. Under those formulas, HSBC Mortgage Services could agree to a price that included a premium above the principal amount of the underlying loan it was purchasing.

13. HSBC Mortgage Services purchased numerous loans from CreveCor in accordance with the terms of the Loan Purchase Agreements.

14. CreveCor agreed in both Loan Purchase Agreements that if any loan purchased by HSBC Mortgage Services from CreveCor was paid off by the borrower within the first twelve months of HSBC Mortgage Services' purchase, then CreveCor would refund a certain percentage of the premium paid by HSBC Mortgage Services. (*See* Ex. A (Bulk Loan Purchase Agreement) § 2.5; Ex. B (Flow Loan Purchase Agreement) ¶ 7b.)

15. The percentage of the rebated premium is determined by a formula explicitly set forth in each of the Loan Purchase Agreements. Generally, the percentage of the premium varies proportionally to how early the borrower prepays the loan. For example, if a borrower paid off the loan in the first month, CreveCor would be obligated to rebate 100% of the premium. If a borrower paid off the loan between the 6th and 7th month after HSBC Mortgage Service purchased the loan, then CreveCor would only be obligated to rebate 50% of the loan.

3

16. Under the Loan Purchase Agreements, HSBC Mortgage Services is to apply the amount of any prepayment penalty that it collects from the borrower to reduce the rebate that CreveCor otherwise owes.

17. As part of its regular business practices and administration of its contracts with CreveCor, HSBC Mortgage Services monitors when loans it purchased from CreveCor are paid in full and analyzes whether such payment entitles HSBC Mortgage Services to recapture a percentage of the premium it paid to CreveCor for the loans. Based on such records and as part of its regular and ordinary business practices, HSBC Mortgage Services prepared a summary of loans paid within the first twelve months of HSBC's purchase and the corresponding information relevant to determining the amount of premium rebate due and owing from CreveCor (the "Premium Recapture Summary"). I have attached a true and correct copy of the Premium Recapture Summary hereto as Exhibit C. HSBC Mortgage Services prepared and retained such records, including the Premium Recapture Summary, in the course of its regularly conducted business activity.

18. The column in Exhibit C labeled "Funding Date" indicates the day that HSBC Mortgage Services purchased each loan. The column in Exhibit C labeled "PIF Date" refers to the date that the borrower paid the loan in full and thereby triggered CreveCor's obligation to refund part of the premium.

19. The column in Exhibit C labeled "Premium Paid" reflects the premium that HSBC Mortgage Services originally paid to CreveCor in purchasing the loan. The column in Exhibit C labeled "Recapture Percent" reflects the percentage of the premium that HSBC Mortgage Services is entitled to recapture pursuant to the formulas set forth in the Loan Purchase Agreements given the time between the Funding Date and the PIF Date. The column in Exhibit

4

C labeled "Premium Lost" is the Premium Paid multiplied by the Recapture Percent and reflects the total rebate CreveCor would owe to HSBC Mortgage Services.

20. The column in Exhibit C labeled "Prepay Collected" indicates the amount of any prepayment penalties HSBC Mortgage Services collected from the borrower. Finally, the column in Exhibit C labeled "Recapture Amount" reflects the Premium Lost less the Prepay Collected, and is the net rebate due and owing by CreveCor.

21. Totaling the amounts listed in the "Recapture Amount" column for each loan results in a total Premium Recapture of $779,072.69. CreveCor paid only $170,538.90 of this amount, leaving a total amount owed by CreveCor to HSBC Mortgage Services for Premium Recapture of $608,533.80.

22. In a May 4, 2007 letter (the "Demand Letter"), HSBC Mortgage Services notified CreveCor that as of April 30, 2007, CreveCor owed $608,533.80 to HSBC Mortgage Services for premium recapture under the Loan Purchase Agreements. A true and correct copy of the Demand Letter is attached hereto as Exhibit D.

23. CreveCor has failed to pay any of this amount.

**The Loan Repurchase Provisions**

24. In Sections 4.2 and 4.3 of the Bulk Loan Purchase Agreement, CreveCor made detailed representations and warranties about the nature and characteristics of the individual loans offered and sold to HSBC Mortgage Services.

25. In Section 8 of the Bulk Loan Purchase Agreement, CreveCor agreed that the covenants, representations and warranties set forth in that agreement would survive the delivery and release of the underlying loan documents to HSBC Mortgage Services.

5

26. CreveCor and HSBC Mortgage Services provided explicit remedies in the event that CreveCor breached any of its representations or warranties – namely that CreveCor would repurchase the respective loans. Pursuant to Section 9.1 of the Bulk Loan Purchase Agreement, CreveCor promised to repurchase the respective loans that were the subject of any breached representations, warranties or agreements that remained uncured thirty days after CreveCor received notice of such breaches from HSBC Mortgage Services.

27. In Section 9.2 of the Bulk Loan Purchase Agreement, CreveCor and HSBC Mortgage Services set forth the formula for determining the repurchase price that CreveCor would pay to buy back any loans that Section 9.1 of the Bulk Loan Purchase Agreement obligated CreveCor to repurchase.

28. CreveCor and HSBC Mortgage Services also agreed to similar representation and warranty provisions with repurchase obligations in the Flow Loan Purchase Agreement. Specifically, in Section 4.B of the Flow Loan Purchase Agreement, CreveCor set forth various representations and warranties with respect to loans sold to HSBC Mortgage Services subject to the Flow Loan Purchase Agreement.

29. Pursuant to Section 5 of the Flow Loan Purchase Agreement, CreveCor agreed that the covenants, representations and warranties set forth in that agreement would survive the delivery and release of the underlying loan documents to HSBC Mortgage Services.

30. Pursuant to Section 10 of the Flow Loan Purchase Agreement, CreveCor again promised to repurchase the respective loans that were the subject of any breached representations, warranties or agreement within five days of HSBC Mortgage Services' demand, unless HSBC Mortgage Services, at its sole option, gave CreveCor thirty additional days to cure its breaches.

31. In Section 11 of the Flow Loan Purchase Agreement, CreveCor and HSBC Mortgage Services set forth the formula for determining the repurchase price that CreveCor would pay to buy back any loans that Section 10 of the Flow Loan Purchase Agreement obligated CreveCor to repurchase.

32. HSBC Mortgage Services purchased numerous mortgage loans from CreveCor in full compliance with the terms of the Loan Purchase Agreements, including payment of the purchase price.

33. CreveCor breached one or more of its representations and warranties with respect to certain of those mortgage loans.

34. Where CreveCor ignored its promise to repurchase the mortgage loans, HSBC Mortgage Services attempted to mitigate its loss. For example, in cases in which the original borrower defaulted on a loan that CreveCor should have repurchased, HSBC Mortgage Services took prudent steps to protect itself from further loss by foreclosing on the underlying collateral where appropriate. In doing so, HSBC Mortgage Services incurred significant expenses and costs, including legal fees.

**Liquidation Analysis**

35. As part of its regular business practices and administration of its contracts with CreveCor, HSBC Mortgage Services monitors whether the loans it purchased from CreveCor satisfy the representations and warranties that CreveCor promised in the Loan Purchase Agreements. Based on HSBC Mortgage Services records relating to the loans and as part of its regular and ordinary business practices, HSBC Mortgage Services prepared a summary and analysis of loans which did not satisfy CreveCor's representations and warranties and that were therefore subject to being repurchased by CreveCor.

36. As part of my responsibilities at HSBC Mortgage Services to monitor amounts due under the Loan Repurchase Agreements, I have reviewed and relied on these records and analyses.

37. In the first analysis, HSBC Mortgage Services examined those loans subject to repurchase that HSBC Mortgage Services had already foreclosed such that the collateral securing those loans had been fully liquidated (the "Liquidation Analysis"). I have attached a true and correct copy of the Liquidation Analysis hereto as Exhibit E. HSBC Mortgage Services prepared and retained the Liquidation Analysis in the course of its regularly conducted business activity.

38. The rows in Exhibit E labeled "Account Number" and "Borrower Name" identified the loans that CreveCor was obligated to repurchase under the Loan Purchase Agreements.

39. The rows in Exhibit E labeled "Date Property Sold" and "Sales Price" reflect the date the collateral securing the loan was sold and the purchase price paid to HSBC Mortgage Services.

40. The rows in Exhibit E labeled "UPB" indicates the unpaid principal balance outstanding under the respective loans.

41. The row in Exhibit E labeled "Total Repurchase Price" reflects the amount CreveCor owed to HSBC Mortgage Services pursuant to the formulas set forth in the Loan Purchase Agreements composed of the outstanding unpaid principal balance, plus certain interest, fees, and expenses.

42. The row in Exhibit E labeled "Remaining Loss/Short Fall Due HSBC" reflects the outstanding amount due HSBC after deducting amounts recovered from the sale of the collateral and from other sources.

43. The final column in Exhibit E labeled "Total" sums the figures calculated for each loan to arrive at an aggregated amount due. As reflected in this column, CreveCor originally owed HSBC Mortgage Services $9,236,098.81 to repurchase the loans identified in the "Liquidation Analysis." After failing to receive such amounts from CreveCor, HSBC Mortgage Services liquidated the collateral and deducted the net amount received from the $9,236,098.81 repurchase price owed by CreveCor to arrive at a final amount outstanding of $3,381,867.01.

44. CreveCor has failed to pay any of this amount.

**Damages Analysis**

45. In the second analysis that I reviewed, HSBC Mortgage Services examined loans that CreveCor was obligated to repurchase, but had failed to do so, and for which HSBC Mortgage Services had not yet liquidated the underlying collateral (the "Damages Analysis"). I have attached a true and correct copy of the Damages Analysis hereto as Exhibit F. HSBC Mortgage Services prepared and retained the Damages Analysis in the course of its regularly conducted business activity.

46. The identically labeled rows in Exhibit F mirror the corresponding rows in the Liquidation Analysis. In particular, the row in Exhibit F labeled the "Total Repurchase Price" reflects the amount CreveCor owed to HSBC Mortgage Services pursuant to the formulas set forth in the Loan Purchase Agreements, including the outstanding unpaid principal balance, plus certain interest, fees, and expenses.

47. Aggregating the "Total Repurchase Price" across all loans identified in the "Damages Analysis" results in a total amount of $19,117,549.70 owed by CreveCor to HSBC Mortgages Services.

48. CreveCor has failed to pay any of this amount.

49. The row in Exhibit F labeled "Estimated Exposure" reflects the "Total Outstanding Purchase Price" less a percentage of the estimated value of the collateral securing the underlying loan. Reducing this figure further by subtracting the amounts in the row labeled "Less Anticipated PBIS Payout," reflecting anticipated recoveries under mortgage insurance covering the loan, results in the figure in the last row labeled "Total Estimated Exposure."

50. Aggregating the "Total Estimated Exposure" across all loans identified in Exhibit F results in a total of $3,935,693.82, reflecting HSBC Mortgages' estimate of the net loss it has sustained as a result of CreveCor's failure to repurchase the loans identified in the Damages Analysis.

51. CreveCor has failed to pay any of this amount.

52. Combining the total amounts calculated in the Liquidation Analysis and the Damages Analysis results in a total of $7,317,560.83 that CreveCor owed HSBC Mortgage Services on account of its breached repurchase obligations. Both the Liquidation Analysis and the Damages Analysis were completed on April 16, 2007.

53. In the Demand Letter, HSBC Mortgage Services notified CreveCor that to satisfy its outstanding repurchase obligations, CreveCor owed HSBC Mortgage Services $7,317,560.83 as of April 30, 2007. As of the date of this Affidavit, CreveCor has failed to pay any of this amount.

54. Since April 2007, HSBC Mortgage Services has provided CreveCor notice of at least six additional loans that have become subject to recapture.

55. When HSBC Mortgage Services determines that CreveCor has breached one or more of its representations or warranties with respect to any of the loans HSBC Mortgage Services purchased from CreveCor, HSBC Mortgage Services contemporaneously prepares a

10

letter to CreveCor setting forth the section number of the breached representation and warranty together with a calculation of the repurchase price owed by CreveCor. In the course of its regularly conducted business activities, HSBC Mortgage Services prepared and retained copies of such letters. I have attached true and correct copies of such letters sent to CreveCor since the end of April 2007 hereto as Group Exhibit G.

56.    Totaling the amounts due as reflected in these letters results in an additional $445,460.40 due by CreveCor on account of its repurchase obligations.

**FURTHER AFFIANT SAYETH NOT.**

_____
Robert K. Carse

Subscribed and sworn to before me this 13 day of February, 2008

_____
Notary Public

OFFICIAL SEAL
KATHY A GIBBONS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/25/09

11

CH40159.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 14 day of February 2008, a copy of the foregoing **Affidavit of Robert K. Carse In support of Plaintiff HSBC's Motion for Entry of Judgment by Default Pursuant to Fed. R. Civ. P. 55(b)(2)** was served on Defendant via first class, United States mail, postage prepaid at the following addresses:

CreveCor Mortgage, Inc.
c/o Howard Wegman, President
P.O. Box 6828
St. Louis, Missouri 63144

Howard Wegman
President of CreveCor Mortgage, Inc.
12503 West Watson Rd.
St. Louis, MO  63127

                                                        s/ Blair R. Zanzig